1   JACK W. LONDEN (CA SBN 85776)
    jlonden@mofo.com
2   WESLEY E. OVERSON (CA SBN 154737)
    woverson@mofo.com
3   MORRISON & FOERSTER LLP
    425 Market Street
4   San Francisco, California 94105-2482
    Telephone:   (415) 268-7000
5   Facsimile:   (415) 268-7522

6   Attorneys for Plaintiff
    TAIWAN SEMICONDUCTOR MANUFACTURING
7   COMPANY LIMITED

8                    UNITED STATES DISTRICT COURT

9                 NORTHERN DISTRICT OF CALIFORNIA

10                      SAN JOSE DIVISION

11

12  TAIWAN SEMICONDUCTOR                        Case No.    5:17-cv-05888 BLF
    MANUFACTURING COMPANY LIMITED,
13
                       Plaintiff,
14                                              **TAIWAN SEMICONDUCTOR
         v.                                     MANUFACTURING COMPANY
15                                              LIMITED'S REPLY IN SUPPORT
    TESSERA, INC., TESSERA TECHNOLOGIES,        OF ITS MOTION FOR
16  INC., INVENSAS CORPORATION                  PRELIMINARY INJUNCTION**

17                     Defendants.              Date:    December 21, 2017
                                                Time:    9:00 a.m.
18                                              Ctrm:    Courtroom 3 – 5th Floor

19

20

21          **REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2

**Page**

3  I.      INTRODUCTION. ...................................................................................................... 1

4  II.     TSMC IS LIKELY TO SUCCEED ON THE MERITS. ........................................... 2

5          A.      The Plain Language Of The MTUA and Drafting History Show That
                    TSMC Was Protected From Suit For Its Sales Of Wafers. .................................. 2

6          B.      Cypress Never Reserved the Right to Sue TSMC. .............................................. 5

7          C.      *Post Hoc* Weighing Of MTUA Benefits Cannot Be Used To Avoid
                    Exhaustion. ......................................................................................................... 7

8          D.      The Covenant Binds Tessera. ............................................................................. 8

9          E.      The Relief Sought Is Not Unprecedented. .......................................................... 9

    III.    TSMC HAS SHOWN IRREPARABLE HARM. ..................................................... 9

10  IV.     THE BALANCE OF HARDSHIPS WEIGHS IN TSMC'S FAVOR. .................... 11

11  V.      THE REQUESTED INJUNCTION IS IN THE PUBLIC INTEREST. .................. 13

12  VI.     TESSERA'S REQUEST FOR A BOND IS INAPPROPRIATE. .......................... 14

    VII.    CONCLUSION. ..................................................................................................... 15

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**TABLE OF AUTHORITIES**

2

**Page**

3

**Cases**

*Advanced Micro Devices, Inc. v. S3 Graphics Co., Ltd.*,
No. 11-965-LPS, 2011 WL 5402667 (D. Del. Nov. 8, 2011)...................................................10

*Alling v. Universal Mfg. Corp.*,
5 Cal. App. 4th 1412 (1992)..........................................................................................................6

*Bio-Tech. Gen. Corp. v. Genentech, Inc.*,
80 F.3d 1553 (Fed. Cir. 1996).....................................................................................................12

*Broadcom Corp. v. Qualcomm Inc.*,
No. SACV 05-468-JVS(MGLx), 2005 WL 5925584 (C.D. Cal. Oct. 19, 2005) ....................14

*Castellanos v. Countrywide Bank NA*,
No. 15-cv-00896-BLF, 2015 WL 1906074 (N.D. Cal. Apr. 27, 2015) ....................................12

*Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*,
321 F.3d 878 (9th Cir. 2003)........................................................................................................15

*Cyrix Corp. v. Intel Corp.*,
803 F. Supp. 1200 (E.D. Tex. 1992) .............................................................................................4

*Cyrix Corp. v. Intel Corp.*,
77 F.3d 1381 (Fed. Cir. 1996).......................................................................................................8

*Fairchild Semiconductor Corp. v. Third Dimension (3D) Semiconductor, Inc.*,
594 F. Supp. 2d 97 (D. Me. 2009) ...............................................................................................13

*Gen. Protecht Grp., Inc. v. Leviton Mfg. Co.*,
No. 10-cv-1020, 2010 U.S. Dist. LEXIS 137160 (D.N.M. Dec. 7, 2010)...................................9

*Hill-Rom Servs., Inc. v. Stryker Corp.*,
No. 1:11-cv-1120, 2012 WL 5878087 (S.D. Ind. Nov. 20, 2012) ............................................11

*Impression Prods., Inc. v. Lexmark Int'l, Inc.*,
581 U.S. ___, 137 S. Ct. 1523 (2017)......................................................................................1, 2

*In re Yan*,
381 B.R. 747 (N.D. Cal. 2007) .....................................................................................................6

*Innovus Prime v. Panasonic Corp.*,
No. C–12–00660–RMW, 2013 WL 3354390, (N.D. Cal. July 2, 2013) .....................................8

*Intel Corp. v. Broadcom Corp.*,
173 F. Supp. 2d 201 (D. Del. 2001) ..............................................................................................3

# TABLE OF AUTHORITIES
## (continued)

Page

*Intel Corp. v. ULSI Sys. Tech., Inc.*,
  995 F.2d 1566 (Fed. Cir. 1993)......................................................................................8

*LifeScan Scot., Ltd. v. Shasta Techs., LLC*,
  734 F.3d 1361 (Fed. Cir. 2013)..................................................................................3, 8

*Lite On It Corp. v. Toshiba Corp.*,
  No. CV 07-04758-SGL(AJWx), 2009 WL 10673953 (C.D. Cal. Jan. 12, 2009)....................12

*Meds. Co. v. Hospira, Inc.*,
  827 F.3d 1363 (Fed. Cir. 2016)......................................................................................4

*Microsoft Corp. v. Motorola, Inc.*,
  795 F.3d 1024 (9th Cir. 2015)........................................................................................9

*Realtek Semiconductor Corp. v. LSI Corp.*,
  946 F. Supp. 2d 998 (N.D. Cal. 2013) .......................................................................2, 9

*Rite-Hite Corp. v. Kelley Co., Inc.*,
  56 F.3d 1538 (Fed. Cir. 1995)......................................................................................15

*Riverisland Cold Storage, Inc. v. Fresno-Madera Prod. Credit Ass'n*,
  55 Cal. 4th 1169 (2013) ................................................................................................6

*SCC Alameda Point LLC v. City of Alameda*,
  897 F. Supp. 2d 886 (N.D. Cal. 2012) ......................................................................4, 6

*Tessera, Inc. v. Advanced Micro Devices, Inc.*,
  No. 05-cv-4063 CW, 2007 WL 3232441 (N.D. Cal. Nov. 1, 2007)..........................9

*Tex. Instruments Inc. v. Cypress Semiconductor Corp.*,
  90 F.3d 1558 (Fed. Cir. 1996)........................................................................................7

*Tex. Instruments, Inc. v. Tessera, Inc.*,
  231 F.3d 1325 (Fed. Cir. 2000)......................................................................................9

*Trade Assocs. v. Makita*,
  No. C88-1028C, 1990 WL 10848940 (W.D. Wash. Mar. 2, 1990)..........................14

*TransCore, LP v. Elec. Transaction Consultants Corp.*,
  563 F.3d 1271 (Fed. Cir. 2009)..............................................................................1, 5, 7

**Statutes**

Cal. Civ. Code § 1856 ......................................................................................................6

1

## I.    INTRODUCTION.

2       Patent rights are exhausted upon the first authorized sale, whether that sale occurred in the

3  United States or abroad, and a patent owner cannot retain rights even if such a limitation is

4  expressly stated in an agreement.  *Impression Prods., Inc. v. Lexmark Int'l, Inc.,* 581 U.S. ___,

5  137 S. Ct. 1523, 1534 (2017).  Once an authorized sale or other transfer of title occurs, whether

6  under a license or a covenant not to sue, the patent rights are exhausted, and the customer may not

7  be sued for infringement.  Against this backdrop, the key question here is not whether Cypress

8  Semiconductor Corp. ("Cypress") intended to exclude TSMC's customers from the covenant not

9  to sue (the "Covenant").  Instead, the key question is what ***TSMC*** activities are authorized by the

10  Covenant.  *TransCore, LP v. Elec. Transaction Consultants Corp.*, 563 F.3d 1271, 1275 (Fed.

11  Cir. 2009).  By covenanting not to sue on claims ██████████ TSMC's ████████████

12  ████████████████████████ Cypress authorized TSMC's sales to its customer

13  Broadcom of wafers made using TSMC ████████████████████████████

14  ████████   This triggers patent exhaustion.

15       In Tessera's International Trade Commission ("ITC") action, the Administrative Law

16  Judge ("ALJ") was led off of this path by Tessera's argument that the effect of patent exhaustion

17  should influence the interpretation of the Covenant.  Specifically, Tessera argued that because

18  Cypress intended the Covenant not to extend to TSMC's customers, the Covenant should be

19  interpreted so that Cypress may sue Broadcom.  Under this logic, TSMC's sales to Broadcom

20  must not be covered by the Covenant because otherwise Broadcom could not be sued due to

21  patent exhaustion.  But that is not how contract interpretation works.  A party cannot avoid the

22  effect of patent exhaustion by stating that it never intended for that effect to happen.  The scope of

23  the Covenant must be decided based on its language, not on what Cypress might have

24  subjectively desired when the contract was signed.

25       The plain language of the Covenant establishes that TSMC was authorized to sell the

26  wafers sold to Broadcom.  What possible purpose would a Covenant covering claims arising from

27  ████████████████████████████ serve if TSMC could not transfer the

28  products it manufactured to its customer Broadcom?

1    Even if the Court is inclined to look past the plain language, then it should look no further

2    than what Cypress wrote when sending its proposed ███████████████ language for the

3    Covenant.  Cypress told TSMC that ███████████████████████████████████

4    ██████ (TSMC's Mot. for Preliminary Injunction ("Mot."), ECF No. 7-5, at 18; Kuo Decl. Ex.

5    8 (ECF No. 7-15).)  That can only mean that Cypress represented it would not sue TSMC for

6    sales to customers of wafers made by TSMC.  Cypress's concise summary of the Covenant—

7    ██████████████████████—captures the parties' intent:  that TSMC and Cypress, each with

8    substantial patent portfolios, would agree to "patent peace" during the term of the Master

9    Technology Usage Agreement ("MTUA," *see* Londen Dec. Ex. 16 (ECF No. 7-6)).  Tessera

10   cannot narrow that agreement by inventing uncommunicated limitations on that promise.

11   Tessera argues that the relief sought here is unprecedented.  But this Court has previously

12   enjoined a party pursuing an ITC action from conduct inconsistent with its contractual

13   obligations.  In a similar case, where enforcement of an Exclusion Order by the ITC would have

14   violated a contractual provision requiring licensing negotiations, Judge Whyte enjoined the party

15   pursuing the ITC action from taking further action inconsistent with its agreement.  *Realtek*

16   *Semiconductor Corp. v. LSI Corp.*, 946 F. Supp. 2d 998, 1009 (N.D. Cal. 2013) (granting

17   "Realtek's motion for a preliminary injunction enjoining defendants' from enforcing any

18   exclusion order or injunctive relief by the ITC that they might obtain against Realtek[.]").

19   TSMC's requested injunction is consistent with *Realtek* and is justified by the law.

20       **II.    TSMC IS LIKELY TO SUCCEED ON THE MERITS.**

21           **A.    The Plain Language Of The MTUA and Drafting History Show That**
               **TSMC Was Protected From Suit For Its Sales Of Wafers.**

22

23   Tessera skirts the key issue in patent exhaustion:  at the time TSMC transferred the title

24   for its wafers to Broadcom, could Cypress have sued TSMC?  As the Supreme Court recently

25   confirmed, "[s]o long as a licensee complies with the license ***when selling an item***," the sale

26   exhausts patent rights.  *Impression Prods.*, 137 S. Ct. at 1534-35 (emphasis added).  Tessera

27   argues that the MTUA is ambiguous, but disregards that Cypress promised not to sue TSMC.

28   ***Cypress***—not TSMC—drafted the Covenant by replacing TSMC's proposed language, ████

1   ██████ that ██████████████████████████████████████████████

2   ████████████████████████████████████████████ (Mot. at 8; *see* Ko Decl. Ex. 8 (M.

3   Sedigh email containing Cypress draft).)  In the very same communication, Cypress stated

4   unequivocally: ████████████████████████████████████ (*Id.*)

5   Cypress's language was adopted, with minor revisions, in the final MTUA.  (*See* MTUA § 14.)

6          Cypress's language for the Covenant, covering claims arising from ████████████

7   ██████████████████████████ cannot be limited to the mere act of manufacturing a wafer.

8   (Mot. at 8-9.)  It is undisputed that, before approaching TSMC, Cypress operated its own foundry

9   business and knew that a foundry's manufacture of products for a fabless customer required

10  transfer of title to the custom manufactured products to the customer.  (*See* Londen Decl. Exs. 3-4

11  (ECF Nos. 9-3 to 9-4); *Intel Corp. v. Broadcom Corp.*, 173 F. Supp. 2d 201, 229-32 (D. Del.

12  2001) (describing foundry business model).)  Cypress and TSMC also understood, from

13  contemporaneous negotiations of a Foundry Services Agreement, that TSMC's ████████████

14  ██████████ encompassed wafer sales, with the transfer of title occurring upon delivery.  (Mot. at 8.)

15  Cypress's own witness testified that he ████████████████████████████████████████████

16  ██████████████████████████.  (Londen Reply Decl., filed herewith, Ex. 21 at 32:20-

17  23, 33:16-35:3; Rice Ex. 24 at 264:2-11.)  The end result:  when TSMC transferred title of wafers

18  to Broadcom, that exhausted Cypress's—and now Tessera's—patent rights.  *See LifeScan Scot.,*

19  *Ltd. v. Shasta Techs., LLC*, 734 F.3d 1361, 1374 (Fed. Cir. 2013) (exhaustion occurs when the

20  product "passes to the hands" of a transferee and when he "legally acquires a title" to it.)

21          Tessera asserts Cypress said that ████████████████████████ would mean only

22  "TSMC *making* products," but relies on a misreading of the drafting history.  (Opp'n at 17-18.)

23  Tessera cannot point to a single contemporaneous document that limited claims arising from

24  ████████████████████████████████████ to "TSMC making products."  Nor is

25  there any evidence that Cypress ever said that sales, such as those to Broadcom, were not

26  included.  Tessera relies entirely on the fact that Cypress's statement that it ████████████

27  is followed by the line: ████████████████████████████████████████████

28  ██████  (Ko Decl. Ex. 8.)  But the latter sentence merely repeats terms from the Covenant and

does not limit it.  Furthermore, Tessera ignores the intervening Cypress sentence: █████████
███████████████████████████████████████████████ (*Id.*)
Cypress's statement that it has █████████████ is unequivocal—it does not reserve an
ability to sue TSMC for sales.

Tessera claims Cypress's disclaimer of any intent to sue was implicitly qualified because
it "followed" the "deletion" of ███████████ from the draft Covenant.  (Opp'n at 18.)  But
Cypress did not "delete" protection for TSMC making sales from the Covenant.  It replaced
claims arising from ████████████ with claims arising from ████████████
██████████████ (Mot. at 8.)  Cypress's ████████████████████
████ was ***simultaneous*** with this substitution, not after it.  (Ko Decl. Ex. 8.)  This is clear
evidence of intent that ***TSMC*** would be fully protected for activities such as those performed for
Broadcom, where it sells the wafers it makes.  *See SCC Alameda Point LLC v. City of Alameda*,
897 F. Supp. 2d 886, 900-902 (N.D. Cal. 2012) (rejecting argument that revision was intended to
allow relief for out-of-pocket costs, where plaintiff's simultaneous edit barred any damages).  In
short, the plain language of the Covenant, combined with Cypress's expressly communicated
intent that it would not sue TSMC, establishes that TSMC's sales to Broadcom were authorized.

Tessera's reliance on the *Medicines* case is unavailing.  There, "manufacturing services"
expressly did not include a transfer of title from contract manufacturer to customer, which
supplied all manufacturing instructions and the key ingredient.  *Meds. Co. v. Hospira, Inc.*, 827
F.3d 1363, 1375 (Fed. Cir. 2016) (*en banc*).  The Federal Circuit found that the manufacturer
merely acted as a pair of "laboratory hands" for the customer, which always retained title to the
products.  *Id.  Medicines* never addresses patent exhaustion.  Furthermore, the ████████████
████████ provided by TSMC and authorized by the Covenant include transfer of title, unlike the
"manufacturing services" in *Medicines*.  Far from being a pair of "laboratory hands," here, TSMC
provided the manufacturing materials and supplied Broadcom with TSMC's own IP.  *Cyrix Corp.
v. Intel Corp.*, 803 F. Supp. 1200, 1205-06 (E.D. Tex. 1992) (finding patent exhaustion where
foundry provided design rules, influenced design and bore the risk of loss until delivery).

1

      **B.**    **Cypress Never Reserved the Right to Sue TSMC.**

2

Tessera argues that the MTUA did not confer "sell" rights because Cypress told TSMC

3

that the Covenant ████████████████████████████████ (Opp'n at 15), but these

4

words appear nowhere in Cypress's negotiation communications to TSMC.  To the contrary, in

5

the most relevant communication—in which Cypress proposed the ████████████████████

6

████████████████████ language for the Covenant—Cypress simultaneously stated that it

7

████████████████ which must include suits for sales TSMC made pursuant to ██████████

8

████████████████████████ Cypress said it wished to remain ████████████████

9

████████████████████████████ (Ko Ex. 8 (emphasis in

10

original).)  But Cypress's clarification that ████████████████████████████████

11

████████████████████ cannot preclude exhaustion in the case of TSMC's sales to

12

Broadcom.  (Mot. at 19.)  In *TransCore*, the Federal Circuit held that exhaustion applied despite a

13

provision stating that no "license or future release" was granted to downstream customers because

14

"intent not to provide downstream rights to [an accused product's] customers is . . . irrelevant" to

15

exhaustion.  563 F.3d at 1277.

16

Tessera relies on a Cypress witness statement prepared for current-day ITC litigation, in

17

which Cypress contends that it ████████████████████████████████ and

18

communicated this position because ████████████████████████████████████

19

████████████████████████[1] (Opp'n at 15; Rice Decl. Ex. 18 (ECF No. 42-

20

10), Q46 and Q47; *see also id.* at Q64-65).[2]  However, extrinsic evidence should not be

21

---

22

   [1] TSMC's emails show that TSMC insisted all communications about the MTUA be in writing.  (*Compare* Opp'n at 12 *with* Ko Decl. Ex. 10 (ECF No. 7-17) ██████████████

23

████████████████; Londen Decl. Ex. 21 at 41:12-19.)  Cypress accepted the final version of the Covenant on March 22, 2012, before the first meeting relied on by Tessera.  (*See* Ko Decl. Ex. 11 (ECF No. 7-18) at 1, 10

24

(Cypress accepting Section 14 on Mar. 22); Rice Ex. 25 (ECF No. 42-17) (Mar. 22 email scheduling meeting).)  In any event, the Cypress witness said he told TSMC in conference calls

25

████████████████████████████████████████████████████

26

████████████ (Rice Decl. Ex. 18 (ECF No. 42-10), Q46.)  This is irrelevant to exhaustion as applied to TSMC's sales to Broadcom here.

   [2] Tessera cites this exchange to argue that TSMC never took the position that the

27

Covenant exhausted Cypress's patent rights until this motion, disregarding TSMC's covenant not to sue defense in another case about a Cypress patent.  (*See* Londen Reply Decl. Ex. 22 at 3-8.)

28

1    considered because the MTUA is an integrated agreement and under the parol evidence rule

2    "extrinsic evidence may not be relied upon to alter or add to the terms of the writing."

3    *Riverisland Cold Storage, Inc. v. Fresno-Madera Prod. Credit Ass'n*, 55 Cal. 4th 1169, 1174

4    (2013); *see also* Cal. Civ. Code § 1856(a) (integrated agreement "may not be contradicted by

5    evidence of a prior agreement or of a contemporaneous oral agreement").  Moreover, the

6    Covenant is unambiguous in its authorization of TSMC's █████████████████████

7    ███████████   Under black letter law, parol evidence is inadmissible to explain or vary its

8    meaning.  *See, e.g.*, *Alling v. Universal Mfg. Corp.*, 5 Cal. App. 4th 1412, 1433 (1992); *In re Yan*,

9    381 B.R. 747, 755 (N.D. Cal. 2007) ("Parol evidence is inadmissible to vary or contradict a

10   written agreement if the agreement is not ambiguous."); *see also* Cal. Civ. Code § 1856(a)-(b).

11           In any event, any "[u]ndisclosed communications and understandings" of Cypress "are not

12   credible extrinsic evidence and may not be used by the Court to determine the parties' mutual

13   intent" regarding the MTUA.  *SCC Alameda Point LLC*, 897 F. Supp. 2d at 897.  Cypress's ITC

14   witness statement never says Cypress communicated that it could sue *TSMC* for TSMC's sales; at

15   most, it says only that Cypress wanted the ability to sue *TSMC's customers* for TSMC's sales to

16   them.  In fact, the same Cypress witness testified at deposition that the Covenant was ████████

17   ███████████████████████████████████████████████████████

18   ████████████████████████████████████████████████

19   █████████████████   (Londen Reply Decl. Ex. 21 at 92:16-24; *see also id.* 71:21-72:21,

20   124:1-9, 124:12-23 (protection afforded by Covenant is that ████████████████████

21   ████████████████████████████████████████████████████

22   ██████████████████████████); Rice Ex. 24 at 268:4-269: 9; 288:23-289:8.)  He testified

23   the MTUA was ████████████████████████████████████

24   ██████   (Londen Reply Decl. Ex. 21 at 63:6-13.)  █████████████████████

25   █████████████████████████████████   (*Id.*)  Far from supporting

26   Tessera's rewriting of a contract, Cypress's litigation statements confirm the parties'

27   understanding that ██████████████████████

28

1

2

### C.    *Post Hoc* Weighing Of MTUA Benefits Cannot Be Used To Avoid Exhaustion.

Tessera offers a grab bag of arguments to the effect that the MTUA conferred too little benefit to Cypress such that it could not have authorized TSMC's sales.  But these self-serving, post-contract descriptions of the parties' bargain ignore that the Covenant provided Cypress with: 1) access to TSMC's cutting-edge technology and 2) mutual "patent peace" between Cypress and TSMC, each of whom has a significant patent portfolio and has offered competing foundry services.  (Mot. at 10.)  Given that Cypress itself was in the foundry business, freedom from suit on TSMC's extensive patent portfolio was a significant benefit to Cypress.  Tessera also cites *post hoc* reasoning from the ALJ that the MTUA was ███████████████████ (Opp'n at 15-16, quoting Rice Decl. Ex. 16.)  But, all labels aside, a mutual covenant not to sue is a licensing deal.  *See Transcore*, 563 F.3d at 1275 (covenant not to sue equivalent to non-exclusive patent license).[3]

Tessera further argues, based on Cypress's self-serving characterization, that ████████ ██████████████████████████████████████████████████████████ (Opp'n at 7.)  Not so.  Cypress attempted to limit the MTUA in this fashion, but TSMC deleted Cypress's proposed provision.  (Ko Decl. Exs. 3, 4, 9 (ECF Nos. 7-10, 7-11, 7-16); Rice Decl. Ex. 24 at 292:2-18.)  Moreover, ████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████████ (Londen Decl. Ex. 17 (ECF No. 7-7); Ko Decl. Exs. 12-13 (ECF Nos. 7-19 to 7-20).)  Cypress's witness admitted that ██████████████████████ ██████████████████████████████████████████████████████████ █████████████████████████ (Rice Decl. Ex. 18, Q73-76.)

Tessera's argument that the application of patent exhaustion in this case would lead to "absurd results," namely the "reshaping of the business deal," puts the cart before the horse.  (*See*

---

[3] Tessera argues that there is no likelihood of success because the ALJ already ruled on the issues.  (Opp'n at 12.)  This argument ignores the many cases holding that ITC decisions have no preclusive effect in district court.  *See, e.g.*, *Tex. Instruments Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1569 (Fed. Cir. 1996); Mot. at 17 n. 8.

1   Opp'n at 17-18.)  Cypress received enormous value from the MTUA, which remains in effect to

2   this day.  *See* Londen Decl. Ex. 17 (██████████████████████████████████████████████

3   ██████); Ko Decl. Exs. 12-13 (same).  "[C]onditioning patent exhaustion on the adequacy of the

4   patentee's reward 'would cast a cloud of uncertainty' over every transaction and every patented

5   product."  *Lifescan*, 734 F.3d at 1377, quoting *Tessera, Inc. v. ITC*, 646 F.3d 1357, 1370 (Fed.

6   Cir. 2011).  The Court must instead interpret the contract as written.  The Federal Circuit has

7   found in multiple "foundry cases" that the foundry's sales exhausted patent rights, to the

8   displeasure of the patent owners.  *See, e.g.*, *Intel Corp. v. ULSI Sys. Tech., Inc.*, 995 F.2d 1566,

9   1569 (Fed. Cir. 1993) (displeased patent owner cannot "now renege on that grant" to foundry of

10  right to make unrestricted sales); *Cyrix v. Intel Corp.*, 77 F.3d 1381, 1387–88 (Fed. Cir. 1996).

11  Tessera's *post hoc* weighing of the MTUA's benefits cannot be used to avoid exhaustion.

12                     **D.      The Covenant Binds Tessera.**

13          Tessera's argument that it is not bound by the Covenant rings hollow.  (Opp'n at 18-19.)

14  Tessera makes no attempt to even address *Innovus Prime v. Panasonic Corp.*, which confirms

15  "[i]t is a longstanding principle that an assignee of a patent takes the patent subject to prior

16  licenses."  No. C-12-00660-RMW, 2013 WL 3354390, at *5 (N.D. Cal. July 2, 2013).  Because

17  "[p]atent owners cannot transfer an interest greater than what they possess . . . assignees take[ ] a

18  patent subject to the legal encumbrances thereon."  *Id.* (citation omitted).  Tessera does not

19  dispute that Cypress was bound by the Covenant.  Thus, Tessera cannot dispute that, when

20  assigning the '946 patent, Cypress could not transfer rights greater than it held.

21          Instead, Tessera tries to circumvent these fundamental principles by arguing Cypress

22  never contractually transferred the MTUA agreement or any one of its obligations to Tessera.

23  Citing the Assignability section of the MTUA, Tessera suggests that the Covenant is void because

24  it transferred without TSMC's prior written approval.  (Opp'n at 18-19; MTUA, § 9.)  But no one

25  is contending that Cypress assigned the entire MTUA to Tessera or that the covenant is binding

26  on Tessera because of an assignment of contractual rights and obligations.  Rather, Cypress

27  assigned the patent to Tessera, and, under the undisputed case law, it assigned these patent rights

28  subject to any prior encumbrances, including the Covenant.

1

**E.      The Relief Sought Is Not Unprecedented.**

2          Tessera argues that the type of relief that TSMC requests here is unprecedented.  But as

3     set forth in TSMC's Motion (Mot. at 2), several courts have enjoined parties involved in ITC

4     proceedings when a contractual limitation applied.  *See, e.g.*, *Realtek*, 946 F. Supp. 2d at 1008-09;

5     *Tex. Instruments, Inc. v. Tessera, Inc.*, 231 F.3d 1325, 1331 (Fed. Cir. 2000); *Microsoft Corp. v.*

6     *Motorola, Inc.*, 795 F.3d 1024, 1034 (9th Cir. 2015); *Gen. Protecht Grp., Inc. v. Leviton Mfg.*

7     *Co.*, No. 10-cv-1020, 2010 U.S. Dist. LEXIS 137160, at *81-86 (D.N.M. Dec. 7, 2010).  Given

8     that Tessera was the party sought to be enjoined in *Texas Instruments*, it should know better than

9     to claim otherwise.

10

**III.     TSMC HAS SHOWN IRREPARABLE HARM.**

11         Tessera does not dispute that TSMC will suffer irreparable harm if the Initial

12     Determination is made final, as described by TSMC (Mot. at 20-23); it offers no rebuttal to the

13     inevitable industry disruption, indemnity claims, and lost revenues that would result.  It suggests,

14     however, that TSMC's alleged "delay" in filing undermines its claim to irreparable harm here.

15     (Opp'n at 19-20.)  That argument falls flat.  TSMC filed this action at the proper time to avoid the

16     irreparable harm that inevitably will come if a cease-and-desist order and import ban issue in the

17     ITC.  TSMC filed this motion on October 13, 2017, leaving enough time for the hearing to occur

18     promptly after a final ruling at the ITC, which was anticipated to occur on December 1, 2017

19     (now deferred to December 13).  There was thus *no delay* in seeking relief.  If TSMC had sought

20     an injunction earlier than the time of the final ITC determination, Tessera would undoubtedly

21     have argued that there was no "imminent" injury such that the filing was unnecessary and

22     premature.  Moreover, an earlier filing could have forced the Court through an unnecessary

23     exercise if the ALJ had ruled in Broadcom's favor on the patent exhaustion issue.

24         An ITC exclusion order, if issued and enforced, will disrupt TSMC and an entire industry

25     of its downstream customers in a way that is not remediable through later damages.  (Mot. at

26     20-23.)  *See Tessera, Inc. v. Advanced Micro Devices, Inc.*, No. 05-cv-4063 CW, 2007 WL

27     3232441, at *6 (N.D. Cal. Nov. 1, 2007) (where "temporary ban on imports would disrupt

28

1   [defendants'] business and damage relations with their customers," harms "cannot readily be

2   quantified and thus are irreparable.").  Tessera's allegation of "delay" does not negate that

3   irreparable harm.

4          Tessera makes much of the fact that TSMC did not intervene in the ITC action, which

5   involves a myriad of issues and additional patents unrelated to TSMC.  But TSMC had no duty to

6   intervene in that proceeding to vindicate its rights under its agreement with Cypress.  Indeed, the

7   contractual right that TSMC obtained was exactly the right *not* to be required to participate as a

8   defendant in patent infringement proceedings.  Tessera knows full well of the burdens involved in

9   entering an ITC action.  TSMC is a foreign entity that makes and sells wafers abroad.  Tessera did

10  not accuse TSMC-made products.  It targeted Broadcom products, which are made by a number

11  of foundries, and it is still unable to tell TSMC which are the TSMC product numbers in the

12  accused Broadcom products.  TSMC was well within its rights in declining to intervene in the

13  ITC where thousands of products were involved and without any clarity as to which ones were

14  made by TSMC.  While Tessera acts as if patent exhaustion was a focus of the ITC proceedings,

15  it was just a small part of the overall case, with just a few pages devoted to the issue in a 264-

16  page Initial Determination.  (Rice Decl., Ex. 1 at 62-68; *see also id*. Ex. 16 (unredacted version).)

17         Tessera's reliance on *Advanced Micro Devices, Inc. v. S3 Graphics Co., Ltd.*, No. 11-965-

18  LPS, 2011 WL 5402667 (D. Del. Nov. 8, 2011), is unavailing.  (*See* Opp'n at 21.)  That case

19  involved a patent ownership dispute between AMD and S3.  S3 had filed an ITC action against

20  Apple asserting the patent in dispute.  AMD filed a motion to intervene in the ITC proceeding,

21  fully briefing the ownership issues.  However, it also filed a district court action and sought a

22  preliminary injunction ordering S3 to *dismiss* the ITC action.  As of the time the court considered

23  the preliminary injunction motion, it was uncertain which way the ITC's final determination

24  would come out.  *Advanced Micro Devices*, 2011 WL 2402667 at *1.  Given these facts, the

25  continued pendency of the ITC action did not justify an order to dismiss the ITC action.  Here, by

26  contrast, TSMC seeks an order for Tessera not to oppose a stay and has timed its motion so that

27  there will be a final determination in the ITC before any injunction would issue here.  If a final

28  determination is issued by the ITC that bans importation of Broadcom products containing TSMC

1  wafers due to the '946 patent, at that point, irreparable harm cannot be disputed.[4]  Given

2  Tessera's excessive bond request, if this motion is granted, it cannot dispute the stakes involved

3  in this action.  As stated in TSMC's Motion (Mot. at 22), it is uncertain that Tessera could

4  reimburse TSMC for its losses from any exclusion order, a fact that Tessera has not disputed.[5]

5              **IV.    THE BALANCE OF HARDSHIPS WEIGHS IN TSMC'S FAVOR.**

6              As set forth in TSMC's Motion (Mot. at 23), the balance of hardships weighs heavily in

7  TSMC's favor.  Tessera bought the '946 patent, not to use it in its own manufacturing business,

8  but to assert it against other practicing entities.  Tessera does not make or sell chips and does not

9  compete with TSMC or Broadcom.  On the one hand, if the requested injunction is denied,

10  Tessera can cause a major disruption of an entire industry, thereby potentially forcing an unfair

11  ransom payment (and indemnity claim) far in excess of a reasonable royalty.  (*See, e.g.*, Londen

12  Decl. Ex. 7 (ECF No. 9-7).)  On the other hand, if the requested injunction issues, Tessera will

13  face no comparable hardships as Tessera does not sell covered chips.  The industry will not be

14  disrupted, and the patent exhaustion issues can be determined in this Court (or in the Federal

15  Circuit), and Tessera could still receive a reasonable royalty on all further sales if its position is

16  ultimately vindicated.  Delay in relief for Tessera is simply a matter of an accounting.  The

17  hardships on TSMC and its customer Broadcom are far worse if the injunction is denied.

18             First, Tessera argues that the impending expiration of the '946 Patent weighs in its favor

19  (Opp'n at 21), but it has this backwards.  The fact that the '946 patent will expire in October,

20  2018 means that the patent was already in effect for over a decade.  A patent owner who waits to

21  the very end of its term should not receive any favors in equity.  *See Hill-Rom Servs., Inc. v.*

22

23  _____

       [4] Tessera does not address TSMC's argument that Broadcom's indemnity claim against
24  TSMC will cause irreparable harm if an injunction does not issue.  Without an injunction here,
    Tessera will leverage the chaos that would come from an import ban to force an unfair settlement
    with Broadcom, ███████████████████████████████████.  (Rice Decl. Ex. 33
25  (ECF No. 42-25).)  Tessera did not dispute these facts in its Opposition.

26         [5] Tessera claims that any injunction here would be ineffective in the ITC.  As set forth in
    TSMC's Opposition to Tessera's Motion to Dismiss, filed contemporaneously herewith, this is
27  incorrect.  (TSMC Opp'n, § II.B.)  Moreover, previous courts confronting these facts have issued
    injunctions despite the alleged inevitability of the ITC's actions.  (*See supra*, section II. E.))
28

1    *Stryker Corp.*, No. 1:11-cv-1120, 2012 WL 5878087 at *3 (S.D. Ind. Nov. 20, 2012) (plaintiff

2    waited years to bring suit and prejudice from patent expiration was of its own making).

3    Moreover, the massive disruption caused by an exclusion order cannot be justified when the

4    remaining patent term is only a matter of months. If Tessera is able to survive the patent

5    exhaustion issue (which it should not), it can still seek damages for any infringing activities and

6    be made whole in that matter. It is not a hardship for Tessera to have to seek such damages.

7         Second, Tessera claims that its stock dropped ***nine years ago*** when a stay issued in an

8    unrelated case. (Opp'n at 21-22.) Its accounting expert reveals in his declaration that the stock

9    price recovered after the stay was lifted. (Martinez Decl. (ECF No. 43-6) ¶ 22.) There is no

10   proof that any of this has any relation to what is happening today in this case. A speculative and

11   temporary stock price adjustment is not a valid basis for claiming hardship here.

12        Third, Tessera claims that, by its alleged delay in filing this case, TSMC is forum

13   shopping, such that TSMC's hardships should be ignored. (Opp'n at 22.) As discussed above,

14   TSMC has not delayed its filing of this motion. It filed at the appropriate time given the

15   December 1 deadline for a Final Determination at the ITC. Moreover, TSMC has every right to

16   ask an Article III judge to address these issues. The ALJ's ruling has no binding effect in this

17   Court. *Bio-Tech. Gen. Corp. v. Genentech, Inc.*, 80 F.3d 1553, 1564 (Fed. Cir. 1996); *see also*

18   Mot. at 17 n. 8 (collecting cases). Tessera did not sue TSMC in the ITC or in the district court in

19   Delaware, instead suing TSMC's customer and over a dozen other parties. It should not now

20   complain of "forum shopping" when TSMC has filed in Tessera's own home judicial district.[6]

21        Finally, Tessera's attempt to cast doubt on TSMC's lost revenue (Opp'n at 22) misses the

22   mark. TSMC's declarant, YT Kuo, stated that TSMC's overall business with Broadcom is ███

23

24        [6] Tessera's "forum shopping" cases are not to the contrary. In *Castellanos v. Countrywide
         Bank NA*, No. 15-cv-00896-BLF, 2015 WL 1906074 (N.D. Cal. Apr. 27, 2015), the plaintiff first

25   filed in bankruptcy court, then in state court, and finally, after losing a preliminary injunction
         motion, dismissed the state court action and filed in federal court. In *Lite On It Corp. v. Toshiba

26   Corp.*, No. CV 07-04758-SGL(AJWx), 2009 WL 10673953 (C.D. Cal. Jan. 12, 2009), plaintiff
         filed two actions, one in California and another in Taiwan, without notifying the California court

27   of same. It then attempted to have the defendants' parallel action in Taiwan enjoined as a breach
         of the parties' forum selection clause. *Id*. In contrast, TSMC has filed just one action.

28

1   ████   per year and that the amount related to the accused products is over ████

2   ██ .  (Kuo Decl. (ECF No. 7-22) ¶¶ 12-13.)  Tessera served TSMC with a document request

3   asking for documents sufficient to show TSMC's revenues related to the accused products at

4   issue in the ITC proceeding.  TSMC responded that it delivers wafers to Broadcom in Asia, then

5   Broadcom integrates them into its own products and sends them around the world.  Tessera was

6   unable to produce a list of TSMC product numbers at issue in the ITC.  TSMC does not have the

7   ability to track what Broadcom does with its wafers after they are purchased, let alone have

8   "documents sufficient to show" the specific wafers at issue in the ITC action.  Given that Tessera

9   is accusing hundreds of Broadcom products that allegedly use TSMC wafers, and the annual

10  revenue TSMC receives from Broadcom, Mr. Kuo was comfortable stating that the amount at

11  issue is over ████ .  This amount is much greater than what Tessera would lose by waiting

12  for its exclusion order until this proceeding (or an appeal to the Federal Circuit) can proceed.

13          **V.    THE REQUESTED INJUNCTION IS IN THE PUBLIC INTEREST.**

14          Tessera cites cases that espouse a general public interest in enforcing patents (Opp'n at

15  23-24), but "the public interest favors enforcement of private agreements to license technology."

16  *Fairchild Semiconductor Corp. v. Third Dimension (3D) Semiconductor, Inc.*, 594 F. Supp. 2d

17  97, 111 (D. Me. 2009).  Were the Covenant not involved, Tessera's citations might carry some

18  weight.  But here, where a private agreement applies such that the patent rights are exhausted,

19  they carry none.  As stated in the motion (Mot. at 24-25), allowing a baseless import ban and

20  cease-and-desist order as to the accused Broadcom products would have a profoundly negative

21  impact on TSMC, Broadcom, and their downstream customers.  These businesses have no

22  alternate supplier, and Tessera does not make a substitute.  Given the existence of the Covenant, it

23  is not in the public's interest for this disruption to occur, particularly where Tessera's patent

24  rights, if any are later found to exist, may be vindicated through a damages remedy.

25          Tessera also argues that this Court should simply defer to the ITC's expertise on this issue

26  (Opp'n at 23-24), but this fails for three reasons: 1) the ITC's ruling is not binding on this Court;

27  2) TSMC was not a party to the ITC action; and 3) this motion will only be heard if the ALJ's

28  erroneous decision becomes final.  If this Court agrees that TSMC was licensed to sell wafers to

1  Broadcom, then this would mean that Broadcom is immune from suit *for TSMC-made chips* (as

2  opposed to chips sourced elsewhere) such that the public has no interest in the ban proceeding.

3  Tessera cites *Broadcom Corp. v. Qualcomm Inc.*, No. SACV 05-468-JVS(MGLx), 2005

4  WL 5925584 (C.D. Cal. Oct. 19, 2005), for the proposition that there is a public interest that

5  favors allowing completion of ITC proceedings.  (Opp'n at 24.)  There, respondent Qualcomm

6  belatedly invoked a forum selection clause after months of discovery in the ITC case and sued in

7  another district court, asking for the ITC action to be stayed.  The court denied Qualcomm's

8  motion.  But these facts are distinguishable.  TSMC is seeking to vindicate its contractual rights

9  for the first time in just one forum and is not a party in the ITC action.

10  Lastly, Tessera fails to acknowledge that it will still have a remedy if the Court grants the

11  requested preliminary injunction.  The ITC has no remedy available other than injunctive relief.

12  It cannot award any legal remedies available to Tessera in court.  *See Trade Assocs. v. Makita*,

13  No. C88-1028C, 1990 WL 10848940, at *2 (W.D. Wash. Mar. 2, 1990) ("The ITC does not have

14  the District Court's remedial power to award damages[.]").  But Tessera could still pursue

15  damages remedies if in the end it prevails on the patent exhaustion issue.  While Tessera has an

16  interest in maximizing settlement pressure through a disruptive import ban, the public does not.

17  The '946 patent expires in October 2018, and it is not in the public interest to disrupt the industry

18  for the intervening months when Tessera never should have brought a claim in the first place.

19  **VI.  TESSERA'S REQUEST FOR A BOND IS INAPPROPRIATE.**

20  In the space of one page at the end of its Opposition, Tessera asks that the Court order

21  TSMC to place a bond for *over half of a billion dollars* if this motion is granted.  (Opp'n at 24-

22  25.)[7]  This is a peculiar request from a party that is simultaneously claiming in its motion to

23

24  ─────────────────
7 TSMC objects to the Martinez declaration (ECF No. 43-6) because Mr. Martinez: (1) ignores

25  that TSMC was not a party to the ITC action; (2) lacks the expertise to estimate what the bond amount will be in the ITC action, given the evidentiary issues involved; (3) provides no estimate

26  of a reasonable royalty, the relevant measure; (4) bases his estimate on total revenues of products sold downstream from TSMC's sales to Broadcom; and (5) relies on a Broadcom financial report

27  stating that 75 percent of its overall purchases from contract manufacturers come from TSMC, without any tie to the percentage of TSMC-made wafers in the accused products or to the value of

28  those wafers as a percentage of the total revenues at issue in the ITC.

1   dismiss that there is not $75,000 in dispute to justify diversity jurisdiction.  (Mot. to Dismiss

2   (ECF No. 41) at 12-14.)  Without citing any authority, Tessera asserts that the bond that should

3   apply here should be based on the bond that would apply in the ITC proceeding.  (Opp'n at 25.)

4   But that proceeding involves additional patents, downstream products that do not contain TSMC

5   wafers, and over a dozen other respondents.  Moreover, the bond in the ITC involves contested

6   issues regarding alleged failures of proof that cannot fairly be invoked against TSMC.[8]

7          Any bond that issues in this Court should be set based on the issues between the parties to

8   this case.  Because Tessera does not make any competing products, at best, it may have a claim

9   for damages based on a reasonable royalty through the expiration of the '946 patent next October.

10  *See Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1548 (Fed. Cir. 1995) (no lost profits if

11  patent is not selling product).  However, Tessera has presented no evidence of what a reasonable

12  royalty would be in this case.  Because district courts are "afforded wide discretion in setting the

13  amount of the bond," *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882

14  (9th Cir. 2003) (citation omitted), "the bond amount may be zero if there is no evidence the party

15  will suffer damages from the injunction." *Id.* (citing *Gorbach v. Reno*, 219 F.3d 1087, 1092 (9th

16  Cir. 2000)).  Because Tessera submitted no evidence of reasonable royalty, and it can be made

17  whole later in a damages proceeding, it has not justified a bond here.[9]  In any event, whether

18  TSMC needs to post a bond may be decided after additional briefing as ordered by the Court.

19  **VII.   CONCLUSION.**

20          For the foregoing reasons, TSMC's motion should be granted.

21

22

---

23  [8] The ITC normally sets the bond at the price difference between the infringing imports and the
    domestic industry products or on a reasonable royalty.  (*See* Rice Decl. Ex. 1 at 261.)  However,

24  in the ITC action, the ALJ lacked evidence regarding such measures, such that the "sheer volume
    and variety of products makes it impossible to determine the appropriate amount of any bond."

25  The ALJ thus decided that "a 100% bond [was] appropriate to prevent harm to Tessera and its
    licensees during the Presidential review period."  The ITC has since granted review of the proper

26  amount of the bond.  (Rice Decl. Ex. 6 (ECF No. 43-2) at 46521.)  The amount of any bond here
    should not be influenced by Broadcom's alleged failure of proof in the ITC action.

27  [9] Determining a reasonable royalty entails proof under the *Georgia Pacific* factors, which cannot
    occur in a 15-page brief.  If the Court requests briefing, TSMC will file papers on the issue.

28

1

2
Dated: November 27, 2017                    MORRISON & FOERSTER LLP

3

4                                            By:   /s/ Jack W. Londen
                                                   Jack W. Londen
5
                                                   Attorneys for Plaintiff
6                                                  TAIWAN SEMICONDUCTOR
                                                   MANUFACTURING COMPANY
7                                                  LIMITED

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28